20-1861 from the District of South Dakota, United States v. Eli Erickson. Mr. Cook, Mr. Rush. Very good, Mr. Rush. Thank you. Everybody pinned here. Please proceed. May it please the court, counsel, judges, I want to thank you for the opportunity to address this through oral argument and provide some additional information that may help when you are reading the briefs, which I believe are well briefed. Mr. Erickson was charged with conspiracy on November 14th, 2018. He had four continuances and myself and opposing counsel were in our last day of trial on the Marcus Smith case when I was asked if I could do a trial in 10 days. Mr. Erickson's prior attorney was unavailable medically for the next 30 days and I agreed to take that trial and myself and Mr. Cook agreed to work fervently in getting the discovery to get to trial, which was 10 days later, but it was actually one work week later. Mr. Erickson would not sign an additional continuance as he had four and his last continuance that was filed was alleged to him to be forged and a review of the jail records would appear to indicate that he had not met with anybody to sign that, so he was insistent on going to trial. We proceeded to trial on November 5th of 2019 and the primary witness was a lady by the name of Marcita Connors. Ms. Connors was sentenced during our trial in a separate hearing to 300 months and was cooperating and was the primary witness of the conspiracy. The difficulty arose after the trial and the fact that opposing counsel realized that there were two audio recordings of the debriefs of Ms. Connors. I received those about two weeks after the trial and I filed a motion for a judgment of acquittal, noting that we had received these and they were substantially different than the summaries that we had been The biggest difficulties was in fact that Ms. Connors, her three debriefs, actually four debriefs were extremely inconsistent and the debriefs that I received by audio were an hour and 21 minutes and 45 minutes long. The summaries that were provided to us were extremely pro-prosecution and left out most of the important details and the judge ruled that we hadn't met the burden for a new trial. While preparing for sentencing I began to believe that my contact with my client was being monitored by law enforcement and so I met with my client on February 5th of 2019 in the jail and told him that I would be sending him a fake email and in that email I would say I would be indicating to him that I'd actually found the additional audio recording. Counsel, this is all in the briefs and you haven't argued government or prosecutorial misconduct but let's get to the issues that are legal issues briefed. We believe that the additional information that was provided in the last email during the last audio recording provides a sufficient basis for Mr. Erickson to a new trial. The fact of the matter is that there's a culmination. We have the issue of the unprovided for and let me first say that I don't believe there was misconduct on the part of Mr. Cook. He provided those he had inadvertently didn't provide the first two. On the third one it was clear that law enforcement after the trial was monitoring my conversation. You haven't made a young blood argument so let's move on. Okay. The basically my client wasn't provided an opportunity to effectively cross-examine the witness and that's why he asked for that. On the second issue of the jury I think this is... Let me jump to the seems to me what's pretty important here. In our Meeks decision we said in order to meet the materiality requirement newly discovered evidence must be more than merely impeaching and what are the inconsistencies? All you've argued is we could have we could have cross-examined more effectively. Don't you? I think you have our case law requires some exculpatory new evidence in order to get it to meet the new trials high bar. Correct and Miss Connors in her testimony in court never once mentioned any of her relatives. During her debrief she blamed a lot or attributed a lot of her drug dealing to her relatives but those didn't end up in the report and at trial she didn't mention those. When we received the things we heard her it wasn't just impeachment it was completely and totally different testimony. No, no, wait, wait, wait. It's got to be exculpatory as to Mr. Erickson. Correct. The fact that there were 80 instead of three co-conspirators doesn't make any difference. If there's nothing removing Mr. Erickson as a conspirator that's my problem. What does remove him is in the interviews she indicates that her drug dealing was with her relatives and not with Mr. Erickson in several occasions that lead to the Exclusively or just on several occasions? On several occasions but we were right. How does how does that affect the jury's how is that likely to have affected the jury's verdict other than as to credibility? It affects the he was charged with a 500 gram conspiracy and if you those uh transactions you remove the total amount of drugs that's required as an element of the offense. And what does that affect? He wouldn't be guilty of a 500 gram conspiracy if he didn't move 500 grams. But how would that would that affect the sentence? No. That would not well not if the correct but the the one of the elements of the jury needed to properly consider was the total weight of the conspiracy. Additionally the conspiracy is an agreement and when you have a witness testifying that her agreement was with her family members and not with my client uh that's that to me is extremely exculpatory. The fact of the matter is is that the all of the have an agreement with Marcita Connors and the evidence of that is is that he had nothing he had not a dime not a car not a nothing absolutely nothing and the explanation that she was dealing through her relatives. Well but but if her if she's also dealing with Erickson and she's dealing with you know so she's a she's a distributor dealing with multiple sub-distributors. How does that affect the likelihood of I don't understand how it's exculpatory as to the conspiracy issue? If you testify that my client distributed the drugs but it was actually your aunt he clearly I mean first of all she has incredible credibility problems. She didn't testify to that during the trial at all. It led to the belief that the conspiracy was with her aunt and not with my client. That's incredibly exculpatory information in my opinion. Additionally we had very little ability to uh her her testimony was wandering and meandering and without the audio recordings many of these recordings happened right as she was picked up. You don't get the information on what she sounded like. I believe that in the first recording she was actually picked up while she was high and that leads to a lot of credibility issues there. Counsel is it two of the three recordings were noted in the summary you got that the summary said there is a recording on two of the three right? Correct. Okay. But and when we we suspected or I knew that there was actually four recordings we just couldn't prove it until I sent this fake email and then law enforcement who was watching my emails read my email and then contacted the prosecutor and said oh yeah and the only time they came forward with that was when I said hey I found and I've got a copy of this recording and that's when they came forward and said to Mr. Cook oh by the way we have this recording. So I mean we we knew of it from other people in the community that it would exist if we just couldn't prove it and it's an extremely unusual case when somebody is monitoring conversations with counsel post-trial. So there's I mean some some very interesting is what I think is most important in this case may be the jury issue though and I'd like to go to that for a second. Can I ask you? Okay. Just just out of the gate with since you don't have a whole lot of time what what are you seeking? What relief are you seeking as a result of what you're saying is you're saying a motion for new trial but are you are you asserting that there should have been a different or additional procedure to to ensure a fair cross-section the jury or are you just asking a motion for new trial based on a change of venue to someplace new? What's the basis of your motion? Um when I didn't with myself and well let me I'll back up. I did three trials in the score on the course of about three months in this district with the same jury panel and what I became aware of was that you couldn't get a fair jury for any of the Native American defendants because they knew the people and knew of the instances and we were essentially getting the jurors who had come from towns that had residential addresses. Saint Francis, Eagle Butte but we wouldn't get those from Rosebud people that require post office boxes because they're not registered voters and when you're not a registered voter you're not a juror. So we had a difficult time and Judge Lang did an amazing job of attempting to keep Native Americans on the jury and these people were family members. These people I mean it was very very difficult and I after three trials got to the conclusion of that we'll never get a fair trial for my client because it's such an isolated and remote area that everybody knows him. Everybody knows his family and the process. What about the other three reservations? I thought there were four within the division. There is but essentially Eagle Butte, Rosebud and Pine Ridge are essentially connected. There's some rural area between those but there's so much intertravel between those and people who have family members that live in each reservation. So I guess I kind of want to get to what relief you're seeking and because I'm not I understand the issue and I understand the problem and I agree that Judge Lang did a very thorough job in trying to address the concerns but what are you seeking? Are you simply seeking a new trial elsewhere because you've conceded or you believe that there's no way to get a fair cross-section in this district? That's correct. Okay. Yeah and I don't think any I don't think it would change the fundamental problem that we have here based on the rural nature and the fact that in the voir dire of these people everybody knows everybody and everybody knows what happened. Well counsel let me ask you the Swain case has a 10% threshold that you probably know about. Correct. Here the disparity difference is 7.4 and isn't that a very high hill for you to climb? It is but when you combine it with the fact that we can't get a fair jury due to this very unique rural nature and the fact that this is a very small area with large families that are all related you end up with this kind of unique section where you're never going to be able to get Native Americans in practice on the jury or you have to take extreme efforts to do that and three trials in a row you get the idea pretty quickly. Did you file a motion for a change of venue? I didn't at the time on each time that we would get the jury poll I would see a lot of Native Americans and then I did do a little motion with the judge afterwards and said after the voir dire I said we can't get a fair trial here and I didn't know I guess we don't really know what to do at that point because he was attempting to keep people on he was doing extraordinary things to keep Native Americans on but we just couldn't do it. So it isn't exactly a Batson challenge but we did have a hearing following it afterwards. What is apparent though is in reviewing the jurors is that it's only people with residential addresses or people who prior to the 20 the Supreme Court case where they stuck down the motor voter bill who had been registered with post office boxes but we just have a very distinct lack of people in these towns that don't have street addresses and that's very apparent in looking at this. So I you know the if you go to the ABA website one of the main pages on the ABA website is talking about how the Native American vote is being suppressed and we had the 2019 Native American voting act that got struck down but there isn't anybody including the ABA that doesn't think that this is a serious issue and if it's a serious issue for registering voters then it's a serious issue for jurors that needs to be addressed so that he can have a cross-section of his peers. And the last thing I want to talk about is Mr. Swally. Mr. Swally was called to testify on one of the last days of trial and he was arrested. He's a homeless meth addict from the same town as my client. He was brought in. You have just a second so I'll ask you the punch line on that one to give you a chance which is boy competency of witnesses where the judge states on the record the judge's view. Is there a case anywhere that overcomes that? No but you know fairness is a perception of the public and when all of these people see a homeless meth addict appear and testify in court you know the original case of fairness is from 1679 was where the judge declared the trial to be fair because both sides could talk. You know fairness is a fundamental thing and I think if you look at this it's just Very good. Mr. Cook. Thank you, your honor. May it please the court, counsel. My name is Cameron Cook and I represent the government in this case. I'm here to answer any questions the court has to explain why the district court got this case right. The first issue I want to address is the debrief or the Marcita Connors audio issue. The first thing I would just say on that is that the government disagrees with defense counsel's interpretation of whether the recordings match the written reports they had in discovery. The government's view those are substantially similar of the recordings and the reports. The district court reviewed both of those in camera or excuse me both the sets of audio recordings and the reports in camera and it determined there was nothing material in there or anything exculpatory that would likely result in a new trial. Those documents and recordings from the records the court can do that too. I pointed out a few instances in the brief where I think defense gets it wrong but just starting with that point that the government does not agree that there is anything of materiality in those recordings that would change the trial. The biggest point about that that I want to bring up which is also in the brief is that the defense did not testify. The other evidence the seven other people who cooperated put Mr. Erickson's involvement in the conspiracy over 500 grands. Michael Bellioum and Jeremiah Swalley themselves put him over 500 and then there were other witnesses who testified about their personal knowledge of receiving meth from him and buying it from him all in the same time frame the conspiracy. And then there are the three different arrests where the defendant was found in possession of firearms and drug paraphernalia. The October 2016 search was home with voluminous amounts of guns in his room and outside the residence. Lots of drug paraphernalia. The June 2018 arrest where another firearm was found. Firearms being tools the drug trade and then more drug paraphernalia and then finally in September 2018 when he fled from law enforcement hid behind the truck and there was a handgun found in the grill where he was hiding and then he dropped $280 in the trail from which he was running. So even if there was anything of those recordings that would be anything other than impeachment the fact is the government's case was very strong and even if you took Marcieta Connors out a conviction is still likely based on the evidence and there was more than sufficient evidence for the jury to convict on all the counts even without Marcieta Connors's testimony. I want to turn to the Sixth Amendment issue now. The brief addresses it and your honors you've mentioned it too the test is not met here. The 7.4 percent absolute disparity which is the second element of the Duren test is almost identical to the Clifford absolute disparity which was an a circuit decision from 1981 and that court held that there was not a prima facie case or there was not unfair and unreasonable representation of the Native American group in the jury veneer. So I think Mr. Cook I do have a question about that second step the absolute disparity calculation you've got the one number being the percentage of the group in the in the population general population is the second number is it the percentage of excuse me of folks in that group that were called to this particular veneer in other words Mr. Erickson's case or is it percentage in the what I'll call the master wheel? Your honor it's my understanding it's the number of Native Americans from that particular veneer so this is in the record the affidavit of the court court I can't remember what document it is it's in the brief but so they're right yeah and I understand it's I'm sorry I'll just get get maybe I didn't make my I didn't pose my question um clearly enough and I understand that in this case then the second number was based on this particular veneer but it seems like in some of the case law there's a suggestion that that second number is from a bigger pool the master wheel of veneers or even over a six-month period of time what's the percentage of folks from that group in that veneer can you speak to that? I cannot your honor I'm sorry I don't have a good answer for that question uh I did not from not in the affidavit filed by the court clerk I did not see any of that information so I would just be speculating so I can't speak on it okay well then can maybe I need to ask me a question even more pointedly which one is the right answer do you know do you have a sense in reading the case law whether it should be the number as to this particular veneer or whether it should be the number from uh six months or a big master wheel? My the government's position is that it should be from the particular case because that's his right I think you run into almost a standing issue um there wasn't an absolute disparity in his case it's a personal right to a fair representation of the community in the veneer and there was a fair representation in this case so I think it should just be in the specific case is the government's position. Counselor are you aware that the Supreme Court in Durham when they set it out was careful to use plural words it says the representation of this group in veneers plural from which juries are selected now of course this is uh the middle prong I get that uh but what do you what do you and then they talk about the jury selection process again this is during Missouri uh and and some cases just say generally potential jurors looking at all these cases so can you really tell from the case law? Your honor I admit I missed that plural uh no that's a good catch so I'm not sure on the answer to that okay no that's fine thank you um but but your honor is even if again if there is more evidence out there of it I don't think you can say this is a systemic problem with the jury selection process this court has approved South Dakota's plan for choosing potential jurors it's fair and uh fair and representative uh parts of the community so even if there is a higher number out there for the absolute disparity if you include the broader set of all veneers I still don't think the third element of the Durham test is met and finally on this topic your honor is just the comment that the court has already mentioned um there are four distinct reservations in the district in the central division of the district of South Dakota this case involved almost entirely facts and individuals on the Rosebud Sioux Indian Reservation there are three others to draw from draw from the government's position is that if there is such notoriety on the Rosebud Reservation to have stopped um stop anyone from that reservation to be on it defense could have moved for a change of venue but he was adamant on having a trial on that specific date and so he went ahead so I don't think it was an it was not an error to let me ask you about the motion for change of venue are you saying that there was no such request no such request or motion was made by the defense and I think that would be the proper remedy if you're concerned about your reputation which seems to be the gist of what defense is arguing has that in your experience or your office's experience has that been um a procedure by which some um defendants have sought excuse me um a more diverse jury is that has that been done in my two and a half years with U.S. Attorney's Office I have not seen that made anywhere in the district um so I just think it is a potential remedy and I also haven't seen this exact issue before so but I do think that is an option if you thought that his reputation was so bad that he had to get a new venue to draw Native American individuals finally um just on Swale I think the court the Jeremiah Swale issue uh the core competency is trial court discretion and credibility is left to the jury the one point I would add that wasn't touched on was that defense got to ask Mr. Swale whether he would take a urinalysis that day and Mr. Swale said no so even despite the judge's well-reasoned determination that Mr. Swale was competent to testify defense still got the benefit of impeaching Mr. Swale's credibility Mr. Swale was testifying about events in 2015 and whether or not he had taken or used methamphetamine around that day in 2019 was irrelevant except for possible impeachment to affect his recollection of events back in 2015 so the jury was able to assess his credibility and indeed defense got to impeach him with that question it was allowed to ask your honors unless the court has any other questions the government would see its time and just ask the court to affirm the verdict in all respects based on briefs and the arguments today very good thank you Mr. Cook let's see Mr. Gust have you got some time I think I think we got all right I think we understand the issues and the case has been well briefed and argued and we will take it under advisement